**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**RUSSELL VANBROCKLEN,**

                                        **Plaintiff,**

                                                                                        **1:08-CV-312**
        **v.**                                                                          **(TJM/RFT)**

**THE UNITED STATES OF AMERICA,**
**TRANSPORTATION SECURITY**
**ADMINISTRATION,**

                                        **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                                        **DECISION & ORDER**

**I.      INTRODUCTION**

        Plaintiff commenced this action _pro se_ against the Transportation Security

Administration ("TSA") based upon events that occurred on September 18, 2007 when

Plaintiff attempted to board a commercial airplane at the Albany International Airport in

Albany, New York.  The Government moved to dismiss the action in its entirety.  Plaintiff

responded with what appears to be an amended complaint, seemingly adding new claims

and withdrawing others. The Government then moved to dismiss the claims in the

amended complaint, to which Plaintiff filed a document opposing dismissal of some of the

claims in the action.  For the reasons that follow, the Government's motions are granted in

part and denied in part.

                                                1

## II.    FACTUAL BACKGROUND

The following facts are taken from Plaintiff's Complaint[1] and accepted as true for purposes of the instant motion.

On September 18, 2007, Plaintiff went to the Albany International Airport ("Airport") intending to take a Southwest Airlines commercial flight to California.  Plaintiff suffers from a "rare medical condition" that causes intense pain in his left testicle when he is in a situation that he considers stressful.  Plaintiff previously had  "an unpleasant experience during a selected screening at Albany International Airport" and,  therefore, he began to feel pain in his left testicle when he arrived at the Airport on September 18, 2007.[2]  He determined that he would abandon his plans to fly to California if he had been pre-selected for secondary screening.   Plaintiff went to the Southwest ticket counter, checked in and received his airline ticket, and saw that he had not been pre-selected for secondary screening.  Based upon this discovery, he determined that he would continue with his plans to fly to California.  Nonetheless, the apprehension about the screening process caused Plaintiff to suffer an increasing pain in his left testicle that made it difficult for him to walk, so he requested, and received, a wheel chair to move from the ticket counter to the security screening area.   Although he did not articulate his thoughts, Plaintiff intended

---

[1]The factual allegations in Plaintiff's Amended Complaint are the same as those contained in the Complaint.

[2]Plaintiff refers to the screening process implemented by the Under Secretary of Transportation for Security to "provide for the screening of all passengers and property . . . that will be carried aboard a passenger aircraft operated by an air carrier or foreign air carrier in air transportation or intrastate air transportation." 49 U.S.C. § 44901. In the Complaint, Plaintiff refers alternatively to "selected screening" and "secondary screening."  The Court understands these terms to refer to a process employed by the TSA which involves a more thorough examination of a person and his or her baggage and carry-on items than offered by the metal detector and the x-ray examination of the baggage that takes place at the initial screening.

to stand and walk through the metal detector at the entrance to the security screening location.

When Plaintiff approached the security screening location in the wheel chair,

a friendly TSA screener John Doe came over [and] put his hands on the Plaintiff[']s shoulder and started [] steering the Plaintiff towards the secondary screening area. The Plaintiff screamed out in extreme pain due to pain in the Plaintiff[']s left [testicle][3] (which felt worse than a testicular torsion). The Plaintiff also lost control of his hands for several minutes. The Plaintiff[']s hands curved in and were mostly frozen into a club like state.

Compl. ¶ 12.

On the way to the secondary screening area, Plaintiff verbally requested a private screening location. Once in the private screening area, "a friendly TSA screener started the pat down procedure on the Plaintiff[']s torso at which time the Plaintiff screamed out in extreme pain." Id. ¶ 15. An Albany County Deputy Sheriff was called to the private screening area and "ran the Plaintiff[']s [] driver[']s license and told the friendly TSA agents that the Plaintiff['s] record came back clean." Id. ¶ 18. "The Plaintiff took off his shirt so the Plaintiff would not have to be touched on his torso again." Id. ¶ 19. A Southwest Airlines manager was called to the private screening area and, after the manager arrived, "a friendly TSA agent started to pat down the Plaintiff[']s pelvis area." Id. ¶ 21. This caused Plaintiff to scream in "extreme pain," and he "applied his trigger point release device to release his pain." Id. ¶¶ 21-22. Plaintiff told the Southwest Airlines manager that he would not be able to fly that day. He then got up from the wheel chair, walked outside the Airport, and got in a taxi to go to see his doctor. Id. ¶¶ 23-24.

---

[3] Plaintiff uses the term "tactical" in the Complaint but, in latter documents, uses the term "testicle."

3

### III.     PROCEDURAL BACKGROUND

The Complaint seeks compensatory damages for the alleged common law torts of unlawful detention, intentional infliction of emotional distress, and negligent infliction of emotional distress, and for the constitutional torts of unlawful search and seizure in violation of the rights secured by the Fourth Amendment to the United States Constitution. See generally Compl. [dkt. # 1].   On June 25, 2008, the Government moved to dismiss the claims in the Complaint on the grounds that: (1)  Plaintiff failed to exhaust his administrative remedies relative to his common law tort claims as required by § 2675(a) of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2675(a); and (2) Plaintiff failed to state a legally cognizable claim under the Fourth Amendment.  See Govt. Motion, [dkt. # 6]. Plaintiff was given additional time to respond to the Government's motion and, in the interim, the Government wrote to the Court advising that Plaintiff had then-recently submitted an administrative claim to the TSA.  See  Govt.  Letter Motion [dkt. # 11].  In light of this administrative filing, the Government requested that Plaintiff's common law tort claims be dismissed without prejudice to allow the administrative process to run its course, but argued that constitutional torts should be dismissed with prejudice for the reasons that the Government had previously articulated.  Id.

On September 29, 2008, Plaintiff responded to the Government's motion by filing a 38-page document entitled "Amended Complaint."  Plf.  Response [dkt. # 12].  The document is part memorandum of law (containing legal citations and arguments  - including a recitation of the Government's arguments),  part unsworn statement by Plaintiff (reciting the pertinent events and making arguments about them), part exposition on how Plaintiff feels the TSA could better perform its function, and part amended complaint.  The

4

document contains a sub-section with the heading "Old Complaint", id.  pp. 19 - 23,
followed by what appears to be the recitation of the allegations in the "amended
complaint."  Id.  pp.  24-27.  In this latter portion of the document, Plaintiff re-recites the
factual allegations of the events of September 18, 2007 at the Albany International Airport,
id. pp.  24-26 (they are the same factual allegations as contained in the Complaint), and
then, under the subheading of "Legal Claims," asserts claims under "Title III of the
Americans with Disabilities Act" and "Section 504 of the Rehabilitation Act."  Id. pp.  26-34.
In the prayer for relief, Plaintiff seeks declaratory and injunctive relief.  Although the Fourth
Amendment claim is not mentioned in the portion of the document that appears to be the
"amended complaint," Plaintiff does provide argument in earlier portions of the document
in support of his Fourth Amendment claims.  See id.  pp. 10-18.

On November 22, 2008, the Government filed a motion to dismiss the claims
contained in the Amended Complaint.  See Govt's Motion to Dismiss Am.  Compl. [dkt. #
15].  In response to this motion, on December 5, 2008 Plaintiff filed a 74-page document
that appears to be, at least in part, a memorandum of law addressed to the Government's
motion to dismiss the claims in the Amended Complaint.  See Plt.  Response to Motion to
Dismiss Am. Compl.  [dkt. # 17].  The document, however, also addresses what appears
to be a similar case brought by Plaintiff in the Western District of New York, see id., and a
long exposition on why Plaintiff believes the TSA should employ United States Border
Patrol agents at airports throughout the United States.  Id.

**IV.    DISCUSSION**

Given the unorthodox manner that this case has proceeded, the first order of business is determining what claims are before the Court.  Because the Government has not yet filed an answer, Plaintiff is entitled to file one amended complaint without seeking leave of Court.  See  Fed. R. Civ. P. 15(a)(1)(A); Symphony Marketing Solutions, Inc. v. Goetz, 2008 WL 5000042, at * 1  (D. Conn.  Nov.  20, 2008)("A motion to dismiss is not a responsive pleading for the purposes of Rule 15(a).")(citations omitted).  Thus, to the extent that Plaintiff's September 29, 2008 filing can be construed as an amended complaint, his claims alleging violations the ADA and the Rehabilitation Act are before the Court.  Because it is not clear whether Plaintiff continues to maintain the claims asserted in the Complaint (discussed below), the Court will address all claims asserted by Plaintiff in this action.

**a.    ADA Claim**

In his December 5, 2008 filing, Plaintiff concedes that his ADA claim must be dismissed.  See Plt. Response to Motion to Dismiss Am.  Compl., p.  12 ("OK, my ADA claim should be dismissed for reasons stated by the Government.").  The Court agrees, and, therefore, the ADA claim is dismissed with prejudice.  See Agee v. U.S., 72 Fed. Cl. 284, 289 (2006)("Congress has not waived the Federal Government's sovereign immunity with regard to ADA claims.");  Gray v. United States, 69 Fed. Cl. 95, 102 (2005) ("[T]he United States has not waived its sovereign immunity to be sued under the ADA . . . [and the Court of Federal Claims] has no alternative but to dismiss plaintiff's ADA claim.");  see also Agee, 72 Fed. Cl.  at 289 ("[U]nder Title III [of the ADA], the Federal Government is

6

not a private entity operating a public accommodation or service.")(citing 42 U.S.C. § 12181); Cellular Phone Taskforce v. FCC, 217 F.3d 72, 73 (2d Cir. 2000) ("Title II of the ADA is not applicable to the federal government.").

### b. Common Law Tort Claims

Plaintiff has also failed to oppose that portion of the Government's motion seeking to dismiss the common law tort claims, without prejudice, on the grounds that Plaintiff failed to exhaust administrative remedies. Inasmuch as Plaintiff has failed to satisfy his burden of demonstrating that the Court has subject matter jurisdiction over the common law tort claims, see Makarova v. U.S., 201 F.3d 110, 113 (2d Cir. 2000)(the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists), the claims are dismissed without prejudice to refiling. See McNeil v. United States, 508 U.S. 106, 113 (1993)("The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies."); Acosta v. U.S. Marshals Service, 445 F.3d 509, 513 (1st Cir.2006) ("The [FTCA] also contains an exhaustion requirement, which has been viewed as a non-waivable jurisdictional requirement limiting the suit to claims fairly made to the agency.")(citations and interior quotation marks omitted).[4]

### c. Fourth Amendment Claims

The Court turns to Plaintiff's Fourth Amendment claims asserted in the Complaint. "[I]t is well established that an amended complaint ordinarily supersedes the original, and

---

[4]The Court is well aware that a claim may be deemed exhausted if, after six months from the filing of the claim, the agency has not made a final disposition on the claim. See 28 U.S.C. § 2675(a). While the Government has advised the Court that Plaintiff has commenced the administrative process, Plaintiff has not demonstrated that the exhaustion requirement has been fulfilled or that he intends to pursue the common law tort claims in this Court.

renders [the original] of no legal effect." Dluhos v. Floating & Abandoned Vessel, 162

F.3d 63, 68 (2d Cir.1998); see Perkins v. Miller, 2009 WL 539892, at * 1 (W.D.N.Y., Feb.

27, 2009)(stating the same).  Because Plaintiff's Amended Complaint, standing alone,

does not re-assert Plaintiff's Fourth Amendment claims,[5]  this rule would seemingly

support the conclusion that Plaintiff has abandoned his Fourth Amendment claims.

However, because Plaintiff also argues in support of the Fourth Amendment claims in the

same document that contains the "Amended Complaint," the Court indulges the possibility

that Plaintiff intended the Amended Complaint to be a supplement to - and not a

replacement for - the original complaint.  See Weixel v. Bd. of Educ. of the City of N.Y.,

287 F.3d 138, 145-46 (2d Cir.2002) (when a plaintiff is appearing *pro se*, the Court must

construe the pleadings broadly, and interpret them to raise the strongest arguments that

they suggest); see also Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)(a complaint

should be especially liberally construed when it is submitted *pro se* and alleges civil rights

violations).  Thus, the Court will address the merits of the Fourth Amendment claims.

The Government has moved to dismiss these claims pursuant to Rule 12(b)(6) on

the grounds that Plaintiff has failed to state a legally cognizable Fourth Amendment claim.

"A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules

of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading,

utilizing as a backdrop a pleading standard which is particularly unexacting in its

requirements.  Rule 8 of the Federal Rules of Civil Procedure requires only that a

complaint contain 'a short and plain statement of the claim showing that the pleader is

---

[5]The portion of the filing that appears to be the amended complaint neither alleges a Fourth
Amendment violation nor seeks compensatory damages.

entitled to relief.'" Collins v. Artus, 2009 WL 606176, at * 3 (N.D.N.Y. March 9,

2009)(quoting  Fed. R. Civ. P. 8(a)(2)).  In addressing the motion, the Court must accept

the material facts alleged in the Complaint as true, and draw all inferences in favor of the

non-moving party.  ATSI Commc'n, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir.

2007).  To survive a Rule 12(b)(6) motion, "a complaint must plead 'enough facts to state

a claim to relief that is plausible on its face.'" Ruotolo v. City of New York, 514 F.3d 184,

188 (2d Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, ----, 127 S. Ct. 1955,

1974 (2007)).

Thus,  "[t]he burden undertaken by a party requesting dismissal of a complaint

under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether

the plaintiff is ultimately likely to prevail, 'but whether the claimant is entitled to offer

evidence to support the claims." Collins, 2009 WL 606176, at * 3 (citations and interior

quotation marks omitted).   However, while a plaintiff need only plead enough to put a

defendant on notice of a plausible claim to survive a motion to dismiss, a plaintiff who

pleads too much runs the risk of "pleading himself out of court."  See Wheeler v. Pataki,

2009 WL 674152, at * 10 (N.D.N.Y. March 11, 2009).   Here, the material facts underlying

Plaintiff's Fourth Amendment claims presented in the pleadings come perilously close to

pleading Plaintiff out of court on these claims.

"The Fourth Amendment requires government to respect '[t]he right of the people

to be secure in their persons . . . against unreasonable searches and seizures.'  This

restraint on government conduct generally bars officials from undertaking a search or

seizure absent individualized suspicion."  Chandler v. Miller, 117 S. Ct. 1295, 1298 (1997).

Further, the Amendment generally requires a warrant issued on probable cause by a

neutral magistrate inasmuch as "[t]he purpose of the fourth amendment is to protect people from arbitrary and oppressive governmental conduct." Sec. and Law Enforcement Employees v. Carey, 737 F.2d at 201 (citing Michigan v. Tyler, 436 U.S. 499, 504 (1978); United States v. Chadwick, 433 U.S. 1, 7 (1977)).   As applicable here, the Fourth Amendment protects individuals from government searchers of their person because "the Fourth Amendment vests individuals with the right to be free from 'unreasonable government intrusions into their legitimate expectations of privacy.'" Chandler, 117 S. Ct. at 1298 (quoting Chadwick, 433 U.S. at 7 ));  see also Bell v. Wolfish, 441 U.S. 520, 558 (1979); Katz v. United States, 389 U.S. 347, 351 (1967).

However, "[t]o hold that the Fourth Amendment applies to searches conducted by [government actors] is only to begin the inquiry into the standards governing such searches." New Jersey v. T.L.O., 469 U.S. 325, 337 (1985).  The Fourth Amendment does not prohibit all warrantless searches by government actors, but only unreasonable ones. Sec. and Law Enforcement Employees v. Carey, 737 F.2d 187, 201 (2d Cir. 1984). Indeed, it has been repeatedly said that the Fourth Amendment's "'central requirement' is one of reasonableness." Illinois v. McArthur, 121 S. Ct. 946, 948 (2001).

Further,

"where the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable' - for example, searches now routine at airports and at entrances to courts and other official buildings." Chandler v. Miller, 520 U.S. 305, 323, 117 S. Ct. 1295, 137 L. Ed.2d 513 (1997) (holding Georgia's requirement that candidates for state office pass a drug test did not fit within this exception) (citing Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 674-76 & n. 3, 109 S .Ct. 1384, 103 L. Ed.2d 685 (1989) (upholding warrantless drug testing of employees applying for promotion to positions involving drug interdiction)). Thus, "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to

> balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." Von Raab, 489 U.S. at 665-66, 109 S. Ct. 1384.

United States v. Aukai, 497 F.3d 955, 958-59 (9th Cir. 2007)(*en banc*); see also United States v. Colon, 250 F.3d 130, 134 (2d Cir. 2001) ("In determining the reasonableness of a search, the intrusion on an individual's privacy interests is balanced against the search's 'promotion of legitimate governmental interests.'")(quoting Maryland v. Buie, 494 U.S. 325, 331 (1990)).

Under the Supreme Court's "administrative searches" or "special needs" exception to the individualized suspicion and warrant requirements, numerous courts have found random, suspicionless, and warrantless searches of passengers and baggage intended to be on mass transit carriers to be constitutional under the Fourth Amendment. See Cassidy v. Chertoff, 471 F.3d 67 (2d Cir. 2006)(upholding the constitutionality, under the special needs exception, of random, suspicionless, and warrantless searches of the carry-on baggage of ferry passengers on Lake Champlain); MacWade v. Kelly, 460 F.3d 260, 271 (2d Cir. 2006)("We have no doubt that concealed explosives are a hidden hazard, that [New York City's program of random, suspicionless subway baggage searches's] purpose is prophylactic, and that the nation's busiest subway system implicates the public's safety. Accordingly, preventing a terrorist from bombing the subways constitutes a special need that is distinct from ordinary *post hoc* criminal investigation."); United States v. Edwards, 498 F.2d 496, 500-01 (2d Cir. 1974) (holding that hand searches of carry-on baggage at the airport were constitutionally valid because they were reasonable); Aukai, 497 F. 3d at 959 ("[A]irport screening searches, like the one at issue here, are constitutionally

11

reasonable administrative searches because they are 'conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings.'")(quoting United States v. Davis, 482 F.2d 893, 908 (9th Cir.1973)); United States v. Marquez, 410 F.3d 612, 616 (9th Cir. 2005)(random handheld magnetometer wand scan of prospective airline passenger does not violate the Fourth Amendment); United States v. Hartwell, 436 F.3d 174, 178 (3d Cir.)(Search of plaintiff's pocket after plaintiff set off metal detector at airport security checkpoint did not "offend the Fourth Amendment even though it was initiated without individualized suspicion and was conducted without a warrant. It is permissible under the administrative search doctrine because the State has an overwhelming interest in preserving air travel safety, and the procedure is tailored to advance that interest while proving to be only minimally invasive."), cert. denied, --- U.S. ----, 127 S. Ct. 111, 166 L. Ed.2d 255 (2006); see also Aukai, 497 F. 3d at 959, n. 2.[6]

Here, Plaintiff was aware that, before he boarded the airplane, he would be subjected to the initial screening process. Further, Plaintiff was aware that he could have

---

[6] The Ninth Circuit noted in Aukai:

The Supreme Court has not specifically *held* that airport screening searches are constitutionally reasonable administrative searches. On three occasions, however, the Supreme Court has suggested that airport screening searches are constitutionally reasonable administrative searches. See Miller, 520 U.S. at 323, 117 S. Ct. 1295; [City of Indianapolis v. Edmond, 531 U.S. 32, 47-8, 121 S. Ct. 447 (2000)]("Our holding also does not affect the validity of border searches or searches at places like airports and government buildings, where the need for such measures to ensure public safety can be particularly acute."); Von Raab, 489 U.S. at 675 n. 3, 109 S. Ct. 1384 (approving of lower court decisions upholding airport screening searches where there was no reason for suspicion).

497 F. 3d at 959, n. 2 (emphasis in original).

been pre-selected for secondary screening (or else he would not have checked his ticket before proceeding), and that he could have been sent to secondary screening if he did not pass through the metal detector without giving off a positive signal (or else he would not have pre-determined to stand from the wheel chair and walk though the metal detector). Plaintiff's expectation of privacy, at least in relation to the screening process, was minimal. Further, the government has a legitimate interest in protecting the public from air piracy and terrorism on commercial air planes, and the blanket screening process is not unreasonable in the context of which it occurs.  Accordingly, the Court finds no Fourth Amendment infirmity in the suspicionless and warrantless screenings of airline passengers and their carry-on baggage prior to boarding commercial airlines as required pursuant to 49 U.S.C. § 44901.

Further, the facts as presented create no constitutional infirmity in the TSA agent's decision to "steer" Plaintiff to secondary screening.  On September 18, 2007, Plaintiff approached the security screening entrance at the Albany International Airport while seated in a wheel chair.  Once Plaintiff presented to the security screening entrance, the TSA was authorized to begin the screening process. See  Aukai, 497 F. 3d at 960-61;[7]  49

---

[7] The Ninth Circuit wrote in Aukai:

The constitutionality of an airport screening search . . . does not depend on consent, see [United States v. Biswell, 406 U.S. 311,  315 (1972)] and requiring that a potential passenger be allowed to revoke consent to an ongoing airport security search makes little sense in a post-9/11 world.  Such a rule would afford terrorists multiple opportunities to attempt to penetrate airport security by "electing not to fly" on the cusp of detection until a vulnerable portal is found. This rule would also allow terrorists a low-cost method of detecting systematic vulnerabilities in airport security, knowledge that could be extremely valuable in planning future attacks. Likewise, given that consent is not required, it makes little sense to predicate the reasonableness of an administrative airport screening search on an irrevocable implied consent theory. Rather, where an airport screening search is otherwise reasonable and conducted pursuant to statutory authority, 49 U.S.C. § 44901, all that is required is the passenger's election to attempt entry into the secured area of an airport. See Biswell, 406

U.S.C. § 44901; 49 C.F.R. §§ 1540.105; 1540.107.   It is clear that Plaintiff was seated in a metal-framed wheel chair that would have set off the metal detector if he attempted to pass through while in the wheel chair,[8] and, therefore, it was reasonable for the TSA agent to steer him to the secondary screening location to conduct a secondary search.  While Plaintiff verbalized his desire to have the secondary screening in a private location, he did not articulate his desire to stand and walk through the metal detector.  Absent such a request, it was not unreasonable for the "friendly" TSA agent to go about the screening process until Plaintiff stood from wheel chair and walked out of the Airport.

Of course, the search itself must be reasonable.  While lack of consent to the search does not make it unconstitutional, the search must be narrowly tailored to serve the ends for which it is intended. See Aukai, 497 F. 3d at 962 ("Although the constitutionality of airport screening searches is not dependent on consent, the scope of such searches is not limitless. A particular airport security screening search is constitutionally reasonable provided that it is no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives and that it is confined in good faith to that purpose.")(citation and interior quotation marks omitted).  Given Plaintiff's recitation of the events of September 18, 2007, it appears improbable that a fact finder would conclude that the search conducted in the private secondary screening location was not narrowly tailored to determine whether Plaintiff, seated in a metal-framed

_____

U.S. at 315, 92 S. Ct. 1593; 49 C.F.R. § 1540.107.

497 F. 3d at 960-61.

[8]Plaintiff argues that Defendant violated the Rehabilitation Act because it did not provide him a non-metal wheeler chair to allow him to pass through the metal detector while seated.  He also asserts that he pre-determined to stand and walk through the metal detector.

14

wheel chair, concealed weapons or explosives on his person – but it is not implausible. Upon the development of further facts, it is plausible that a fact finder could conclude that the search in the private screening area was more intrusive than necessary under the circumstances.  Therefore, the Government's motion to dismiss the Fourth Amendment claim is granted to the extent that Plaintiff claims that the TSA's decision to search him in secondary screening violated the Fourth Amendment, but denied to the extent that Plaintiff claims that the search was unduly invasive.

       **d.    Section 504 Claim**

Plaintiff brings a claim pursuant to section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("§ 504"), contending that the "TSA's policy and practice requiring mandatory secondary screening for people in wheel chairs without a determination of security necessity and without provision for reconsideration, reasonable accommodation or waiver, denies the reasonable accommodations required by Section 504."  Am. Compl. ¶ 46.  In this regard, Plaintiff contends that the TSA agent's failure to ask him if could stand up and walk through the metal detector, or to offer him a non-metal wheel chair so he could go through the metal detector while seated, constituted a violation of Section 504.  Id.

Section 504 provides that:

> [n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. 794(a).

The purpose of Section 504 is "to eliminate discrimination on the basis of disability

15

and to ensure evenhanded treatment between the disabled and the able-bodied." Doe v. Pfrommer, 148 F.3d 73, 82 (2d Cir. 1998)(citing Southeastern Comm. College v. Davis, 442 U.S. 397, 410, 99 S. Ct. 2361, 60 L .Ed.2d 980 (1979)).  "In order to establish a violation of § 504 of the Rehabilitation Act, a plaintiff must show: (1) that he has a disability for purposes of the Rehabilitation Act; (2) that he was otherwise qualified for the benefit that has been denied; (3) that he has been denied the benefits solely by reason of his disability; and (4) that the benefit is part of a program or activity receiving Federal financial assistance." Pfrommer, 148 F.3d at 82 (interior quotation marks and citation omitted). "Under the [ ] Rehabilitation Act, a demand for 'reasonable accommodations to assure access to an existing program' is cognizable; but a demand for 'additional or different substantive benefits' is not." Streck v. Board of Educ. of East Greenbush School Dist., 280 Fed. Appx. 66, 68 (2d Cir. 2008)(quoting Wright v. Giuliani, 230 F.3d 543, 548 (2d Cir. 2000) (per curiam)).  As the Second Circuit has held, the "disabilities statutes do not require that substantively different services be provided to the disabled, no matter how great their need for the services may be. They require only that covered entities make 'reasonable accommodations' to enable 'meaningful access' to such services as may be provided, whether such services are adequate or not." Wright, 230 F.3d at 548 (citing, inter alia  Pfrommer, 148 F.3d at 83 (rejecting Rehabilitation Act claim by disabled individual who sought, inter alia, a "job coach," because "what [plaintiff] seeks to challenge is not illegal discrimination against the disabled, but the substance of the services provided to him")).

Liberally construed, Plaintiff's Section 504 claim is premised upon the allegation that he was denied "access" to the TSA's least invasive security screening procedures

16

because he was not offered the opportunity to walk through the metal detector or provided a non-metal wheel chair to roll through it.  As to that portion of the claim based upon the TSA agent's failure to ask Plaintiff if he could to stand and walk through the metal detector, there is no indication that the agent's failure to ask this question was motivated solely by Plaintiff's disability or by an animus against the disabled, and no reasonable fact finder could conclude otherwise.  See Aiken v. Nixon, 236 F. Supp.2d 211, 226 (N.D.N.Y. 2002)(dismissing ADA and Section 504 claims because the claims did not "'draw their substance from any alleged discriminatory animus against the disabled, either under a disparate treatment or disparate impact theory'")(quoting Pfrommer, 148 F.3d at 82), aff'd 80 Fed. Appx. 146 (2d Cir. 2003).  As to that portion of the claim based upon the failure to provide a non-metal wheel chair, the claim seeks additional or different substantive benefits.  Thus, it  is not cognizable under Section 504.  Wright, 230 F. 3d at 548.  Accordingly, Plaintiff's Section 504 claim is dismissed.

## V.     CONCLUSION

For the reasons discussed above, the Government's motions to dismiss the claims in the Complaint and in the Amended Complaint (dkt. nos. 6, 11, and 15) are **GRANTED IN PART and DENIED IN PART**.  All claims are dismissed *except* Plaintiff's Fourth Amendment claim contained in the original Complaint asserting that the search conducted in secondary screening was unduly intrusive.  Plaintiff's common law tort claims are dismissed without prejudice to re-pleading.  Plaintiff is directed to review the Northern District's Local Rules (particularly L.R. 7.1 - 15.1) and the *Pro Se* Handbook[9] before

---

[9]Both of these can be accessed through the Northern District's public website, http://www.nynd.uscourts.gov .

submitting further documents or pleadings in this action.

**IT IS SO ORDERED**

DATED:  March 26, 2009

Thomas J. McAvoy
Senior, U.S. District Judge